**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Aurelio LOPEZ–ORTIZ, John David Kopp and Danny Ray Poston, Defendants-Appellants.**

No. 73–2936.

United States Court of Appeals, Fifth Circuit.

April 4, 1974.

Rehearings and Rehearings En Banc Denied May 16, 1974.

Rehearing Denied July 5, 1974.

Albert Armendariz, Jr., El Paso, Tex. (Court-appointed), for Lopez-Ortiz.

John L. Fashing, El Paso, Tex., for Kopp.

Emmett Colvin, Jr., Dallas, Tex., Frank Moore, Irving, Tex., for defendants-appellants.

Danny Ray Poston, pro se.

William S. Sessions, U. S. Atty., San Antonio, Tex., Ralph E. Harris, Asst. U. S. Atty., El Paso, Tex., James W. Kerr, Jr., Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BELL, THORNBERRY and DYER, Circuit Judges.

BELL, Circuit Judge:

The question in this case as to all three defendants, Kopp, Poston and Lopez-Ortiz, arises from their assertion of error in the denial of a motion to suppress approximately 539 pounds of marijuana seized at the time of their arrests. As will be explained, disposition of this issue turns on whether the arrests were supported by probable cause. As to defendant Lopez-Ortiz, there is the additional question of sufficiency of the evidence to justify his conviction.

The defendants were convicted on a two-count indictment charging in the first count a violation of 21 U.S.C.A. § 846, in that they conspired to possess marijuana with the intent to distribute it, contrary to 21 U.S.C.A. § 841(a)(1); and in the second count, possession of the same marijuana with intent to distribute it, contrary to 21 U.S.C.A., § 841(a)(1). This appeal followed. We affirm as to Kopp and Poston and reverse as to Lopez-Ortiz.

As will be seen, the investigation was begun on the basis of information received from an informer, but there was no effort on the part of the prosecution to establish that the informer was reliable. The customs officer in charge indicated at the hearing on the motion to suppress that he did not wish to give out any information whatever about the informer.

The first information received from the informer was that Dan Poston of Dallas, Texas, was a major dealer in marijuana and made frequent trips to El Paso for the purpose of obtaining marijuana for distribution in other parts of the country. This information was received by a customs agent during the first week of April 1973. The customs agent then checked the name of Poston against customs files and connected Poston with Kopp. The files disclosed that Kopp had been arrested on February 9, 1973 in possession of 320 pounds of marijuana, while driving an automobile leased from an El Paso automobile dealer by Poston. The vehicle had been leased on January 23, 1973 and the lease was renewed by Poston on February 9, the day of Kopp's arrest, through the payment of three hundred dollars.

Thereafter the customs agent received advice from the confidential source that Poston would be in El Paso during the weekend of April 27, 1973 in connection with a marijuana transaction. The agent knew that Kopp resided in El Paso. Putting two and two together, he caused a surveillance to be established in the area of Kopp's residence beginning between 7:30 and 8:00 P.M. on April 27. The surveillance team consisted of seven customs agents, including the agent who had received the information and who had connected Poston with Kopp. The agents were positioned in the area of Kopp's residence and were in radio communication with each other.

Upon beginning the surveillance, the agents observed a 1966 Pontiac sedan in the driveway of the Kopp residence, facing the door of a garage attached to the house, and a 1968 Ford Galaxie in the driveway behind the Pontiac. A Buick Skylark automobile was parked in front of the residence. At 10:15 P.M., a 1969 El Camino pickup truck, with a camper attached, arrived in the area and parked across the street from the Kopp residence. The occupants of the pickup walked across the street and entered the Kopp residence. At 10:30 P.M. the Ford Galaxie left the residence with either one or two unidentified occupants and returned at approximately 11:00 P.M. This time four occupants exited the vehicle and entered the Kopp residence.

At approximately 1:00 A.M., April 28, the Ford Galaxie, occupied only by a driver, pulled out of the driveway, circled the block, and parked in the street in front of the residence. At 1:15 A.M., the El Camino pickup which had been parked across the street was backed into the driveway. It was separated from the garage by the Pontiac which remained immediately in front of the garage. Three of the surveilling agents, at least two using binoculars and positioned from twenty yards to a block away, observed several people unloading large filled gunnysacks from the rear of the pickup and placing the bundles in the garage. The front door of the garage as well as the front of the residence, according to photographs in evidence, were very near the street. The agents who observed this activity notified the participating agents by radio of what they were seeing. The agents then moved in, purportedly to see if a marijuana transaction was taking place, and if so, to arrest the persons engaged in the transaction. Upon moving in, they identified themselves as federal officers, whereupon the participants in the unloading operation broke and ran. Only three persons were apprehended: Poston and Kopp in the immediate vicinity,

and Lopez-Ortiz, who was found hiding behind a rock wall which separated the backyard of the Kopp residence from the next door residence.

Six of the gunnysacks were in view of the officers at the time of the arrests, and the odor of marijuana was prevalent. These sacks were seized, as was another which was discovered by an agent when he flashed his light into the Buick Skylark parked in front of the house in an effort to find one or more of the escapees. Further, an additional sack was found several days later during a search of the Buick's trunk. It is the marijuana in these eight sacks which was the subject of the motion to suppress. Whether the court committed error in denying the motion turns, as we shall explain, on the validity of the arrests and we proceed to a consideration of that issue.

## I.

■ It is important to note at this point that we are not concerned with a search of any sort.[1] We are concerned only with the accepted rule that contraband in plain view may be seized, even though it is on private property, so long as the initial intrusion on to the property is legitimate by virtue of a warrant or an exception to the warrant requirement, at least in circumstances where a warrant for the contraband itself could not have been previously obtained. *See* Coolidge v. New Hampshire, 1971, 403 U.S. 443, 464–471, 91 S.Ct. 2022, 2037–2040, 29 L.Ed.2d 564, 581–586. Since it is clear that there was no time prior to entry to obtain a warrant, we need deal only with whether the initial warrantless intrusion was legal. If it was, the combination of the odor of marijuana and the nature of the plainly visible sacks was sufficient to support seizure of the bags as containing contraband.

As one justification for the agents' presence on Kopp's premises, the government contends that they entered

---

1. Actually one of the eight sacks of marijuana was discovered in a subsequent search of the Buick, as noted above, but counsel for the parties have been satisfied to treat the marijuana taken from the Buick as having the same status as that found in the garage.

merely to inquire of the defendants whether a marijuana transaction was in progress. The general idea is to analogize their entry to the approach of the officers, without probable cause, in Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and Adams v. Williams, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612. However, classifying this entry as a so-called investigative approach strains the facts, inasmuch as it was accomplished by a sudden raid by seven officers. Thus, we pretermit this approach as justification for the officers' presence on the property. Rather, we proceed on the theory that the raid constituted an arrest, that the contents of the plainly visible sacks were apparent to the agents once they were on the property, and that the validity of the seizure thus turns on whether the arrests were valid.

■ The question we must answer is that posed in Beck v. Ohio, 1964, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145:

"Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. . . ."

Were facts and circumstances known to the arresting officers here, or of which they had reasonably trustworthy information, of such sufficiency as to warrant a prudent man in believing that the defendants were committing an offense? We think so.

The sum of the showing on probable cause for the arrests begins with the tip from the informer that Poston was engaged in the marijuana business in El Paso. The customs agent by independent investigation then developed the connection between Poston and Kopp. As heretofore outlined, Poston had supplied the vehicle used by Kopp when he was previously apprehended in possession of a large quantity of marijuana. The informer then supplied the further information that Poston would be in El Paso on a particular weekend in connection with a marijuana transaction. At this point, the officers determined to place the Kopp residence under surveillance.

In the course of the surveillance, the agents saw a pickup truck camper arrive and several people enter the Kopp residence. Subsequently, the camper was backed into the Kopp driveway, and several men then engaged in an unloading operation wherein gunnysacks were moved from the camper and placed in the garage. At this point the arrests were made. The fair inference from the evidence was that the surveilling officers were experienced in apprehending those engaged in the drug traffic and that the sacks which were being unloaded were known to them to be of the type used in packaging marijuana.

We think that the frame of authority to determine this issue is that established by Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, and Beck v. Ohio, *supra*. In *Draper*, an arrest was upheld where based on information received from a reliable informant that Draper was selling narcotics in Denver, was going from Denver to Chicago to obtain narcotics, and would be returning to Denver on one of two trains. The informant gave a description of Draper by color, age, height and weight, described his dress and manner of walking and stated that he would be carrying a tan zipper bag. As it developed, these facts were accurate and lead the officers to Draper, with the result that narcotics were found during a search incident to the arrest. The present case differs from *Draper* in three respects. Here, (1) there was no proof that the informer was reliable, and (2) the information furnished by the informer contained

fewer precise details.[2] But, (3) here the arrest was at a time when sacks, thought to contain marijuana, were being unloaded in the sight of the officers.

In Beck v. Ohio, *supra*, the arresting officers had received information from an informer that defendant was engaged in a lottery operation. In reversing the conviction, on the grounds that the arrest was invalid and would not support the subsequent search, the court noted that the informer had given no information that the defendant would be found at the time and place of his arrest, and that no evidence was introduced as to either what the informer actually said or why the officers thought the tip was creditable. The Court discussed *Draper* and stated that the evidence of probable cause did not reach the level found sufficient in that case. The Court noted that the record did not show that the officers, before arresting Beck, "saw, heard, smelled, or otherwise perceived anything else to give them ground for belief that petitioner had acted or was then acting unlawfully." 379 U.S. at 94, 85 S.Ct. at 227, 13 L.Ed.2d at 147.

This case lies between *Beck* and *Draper*, but nearer *Draper*. The evidence of probable cause, as in *Beck*, does not incorporate a reliable informer, but only an informer of unspecified credentials. Unlike *Beck*, however, here the officers did their own investigative work and corroborated the information received from the informer to the extent of connecting Poston to Kopp, a known marijuana dealer. Also here the informer stated that Poston would be in El Paso at a certain time to purchase marijuana, whereas in *Beck* neither time nor place were specified. Further, and of great importance, the officers here, substitut-

ing their own investigation for the detailed information received from the reliable informer in *Draper*, and in furtherance of the information received from the informer, were able to place themselves so as to view the unloading of what appeared to be bags of marijuana. The quantum of probable cause at this point was near if not equal to that in *Draper*, and far exceeded that of *Beck*.

We thus believe that the officers, as prudent men, were warranted in believing that a crime was being committed at the moment they entered the driveway, announced themselves as federal officers, and effected the arrests. *Cf.* Ker v. California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (arrest, and seizure incident thereto, upheld where based on meeting under suspicious circumstances between defendant and known narcotics wholesaler, and on reliable information that defendant was a marijuana retailer, even though no packages were seen to pass between defendant and the wholesaler at their meeting).[3] For courts of appeals decisions somewhat similar on the facts, see United States v. Cothren, 4 Cir., 1967, 386 F.2d 364, and Cali v. United States, 1 Cir., 1964, 338 F.2d 974.

It is not critical that the informant here was never shown to be reliable. The idea that a reliable informer may somehow supply probable cause while a first-time informer can not is only the beginning of the inquiry. Probable cause rests on the whole of the evidence which is urged in support of police action. It may rest entirely on information from a reliable informer, or it may be based on a combination of informer's information, itself insufficient, and

---

2. Here the time frame was somewhat less precise (a weekend rather than one of two trains arriving one day apart from each other), and the location was much less precise (El Paso, rather than a specific site). Further, a physical description played no role here—while one officer testified that he received a rough description of Poston, there

is no indication that a man matching that description had been seen before the arrests.

3. *Cf.* also United States v. Lee, 1927, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202, where persons on a boat were arrested for revenue and prohibition offenses by agents who saw, through the use of a searchlight, what appeared to be cases of liquor on the deck.

facts generated by independent police investigation.[4]

■■■ An apt analogy is found in cases considering the sufficiency of an affidavit to support a search warrant.[5] Such an affidavit may be based entirely on information received from a reliable informer, if it also relates underlying facts and circumstances which enable the magistrate independently to assess both the validity of the informant's conclusions and the basis of the officer's belief in his reliability. Aguilar v. Texas, 1964, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729. On the other hand, Spinelli v. United States, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637, acknowledges that a warrant may properly issue on the basis of a tip otherwise inadequate under *Aguilar* if it is corroborated to such an extent that it becomes as trustworthy as that in *Aguilar*. 393 U.S. at 415–416, 89 S.Ct. at 588–589, 21 L.Ed.2d at 643. Further, even if the corroborated tip is inadequate to support a warrant on its own, it may nonetheless be combined with other information known to the police to produce probable cause. 393 U.S. at 418, 21 L.Ed.2d at 644–645.

That *Aguilar* and *Spinelli* do not prescribe particular types of information in particular combinations has been previously recognized in this circuit. In Gonzales v. Beto, 5 Cir., 1970, 425 F.2d 963, 968–970, Judge Thornberry concluded that an informer's tip can be buttressed by independent observations which corroborate the details of a tip to the extent of negating the possibility that the informer fabricated his report, or which contribute to a showing of probable cause "by revealing not merely normal patterns of activity but activity that reasonably arouses suspicion . . . ." *Id.* at 969.

Viewed in this framework, our finding of probable cause for appellants' arrests is affected by the unreliability of the tip only to the extent that its inadequacy increases the reliance that must be placed on information obtained by independent police investigation and observation.[6] The total quantum of evidence being sufficient to satisfy the benchmark standards for probable cause of *Draper* and *Aguilar* the arrests must be upheld, and with them the seizure they occasioned.

## II.

This leaves for consideration the sufficiency of the evidence against Lopez-Ortiz. He claimed at trial that he had illegally entered the United States from Mexico some two days in advance of his arrest, that he had stopped at the Kopp residence seeking food, that he had been knocking on the door at the time of the raid, and that he had fled to avoid deportation. This story was impeached in at least three ways at trial, and it was doubtless these inconsistencies that resulted in a jury verdict of guilty. For one thing, Lopez-Ortiz admitted at the time of his arrest that he had been in the house for several hours. Second, at trial he displayed considerable confusion about the time at which he arrived at

4. Indeed, no tip at all is necessary to obtain a warrant if the affiant possesses sufficient personal knowledge. *See, e. g.,* Gonzales v. Beto, 5 Cir., 1970, 425 F.2d 963, 968.

5. That cases concerning probable cause for issuance of search warrants are relevant to inquiries into probable cause for warrantless arrests is established in Spinelli v. United States, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, n. 5:

"While *Draper* involved the question whether the police had probable cause for an arrest without a warrant, the analysis required for an answer to this question is basically similar to that demanded of a magistrate when he considers whether a search warrant should issue."

6. For further cases illustrating the use that can be made of tips by untested or unknown informants, see the following cases cited in United States v. Legato, 5 Cir., 1973, 480 F.2d 408, 412, n. 10: United States v. Berry, 1972, 150 U.S.App.D.C. 187, 463 F.2d 1278, 1281; Government of Canal Zone v. Wright, 5 Cir., 1972, 460 F.2d 1402; United States v. Dzialak, 2 Cir., 1971, 441 F.2d 212; United States v. Viggiano, 2 Cir., 1970, 433 F.2d 716. *See also* DiPiazza v. United States, 6 Cir., 1969, 415 F.2d 99, 104–106. As we noted in *Legato*, the importance of corroboration is a principal teaching of *Draper*.

the house. Finally, his account of what he saw and heard upon approaching and seeking entrance to the residence is not consistent with the unloading operation being carried on at that time.

The issue before us however is not the credibility of Lopez-Ortiz's story. Rather, it is the sufficiency of the evidence connecting him with the marijuana. At best, the evidence establishes only that he was present in the area and had fled from federal officers. It does not show that he actually participated in the unloading operation, or began his flight from near the truck. Further, there was no testimony by the government agents that Lopez-Ortiz had approached and entered the house prior to the raid. Indeed, all the arresting officers could say was that they found him behind a nearby rock wall.

Lopez-Ortiz's situation is similar to that in Williams v. United States, 5 Cir., 1966, 361 F.2d 280, where we reversed the conviction of a defendant who was one of three passengers in an automobile loaded with material intended for use in producing illegal whiskey. Revenue agents had been investigating an unregistered distillery, and had destroyed it with a dynamite charge. Just as the charge went off, they saw three men flee from an automobile stopped on a dirt road two or three hundred yards from the still. Williams denied any knowledge of the illegal distillery operation and any previous acquaintance with the two other men in the vehicle. His testimony was that he had been coon hunting and was walking home along the dirt road when the two men stopped and offered him a ride. He admitted fleeing but stated that he had done so because he had been startled by the dynamite explosion and by the sight of uniformed men, who he thought were soldiers, running out of the woods.

In *Williams,* the government conceded that mere presence is insufficient to prove possession, but contended that presence plus flight made out a case. In dealing with this question, we cited Vick v. United States, 5 Cir., 1954, 216 F.2d 228, and McFarland v. United States, 5 Cir., 1960, 273 F.2d 417. In *Vick,* we held that presence plus flight is insufficient evidence to warrant conviction because the jury cannot reasonably conclude that such evidence excludes every reasonable hypothesis save that of guilt, at least where, as here, there are explanations of presence and motives for flight that are consistent with innocence. In *McFarland,* there was evidence over and above presence and flight, and we upheld the conviction. *See also* Hill v. United States, 5 Cir., 1968, 395 F.2d 694; Pinion v. United States, 5 Cir., 1968, 397 F.2d 27.

Here we have nothing but presence in the area and flight, and so the conviction of Lopez-Ortiz on the possession count cannot be sustained. We also think that there must be a similar result as to the conspiracy count. There was no proof of joint possession or participation by Lopez-Ortiz in the unloading operation, or even of a meeting, between him and an alleged co-conspirator. In short, he was not connected to the conspiracy.

Affirmed as to Kopp and Poston; reversed and remanded for further proceedings not inconsistent herewith as to Lopez-Ortiz.